ESTRELLITA REYES,

      Plaintiff,

v.

BCA FINANCIAL SERVICES, INC.,

      Defendant.

_____/

## ORDER ON PLAINTIFF'S SUMMARY JUDGMENT MOTION

Plaintiff Estrellita Reyes, individually and on behalf of others similarly situated, has sued Defendant BCA Financial Services, Inc. for allegedly violating the Telephone Consumer Protection Act (the "TCPA"). The TCPA prohibits, among other things, the use of an "automatic telephone dialing system" ("ATDS") or an artificial or prerecorded voice to call a person's cellphone absent an emergency or prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as equipment with the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator," and then to "dial such numbers." § 227(a)(1)(A). Each TCPA violation results in damages of no less than $500, which may be trebled for willful or knowing violations. § 227(b)(3)(B)–(C).

BCA Financial collects debts for healthcare companies. To call suspected debtors, it uses a "predictive dialer" maintained by a company named Noble Systems. BCA Financial also accompanies some of those calls with an "interactive voice response" ("IVR"), which is an artificial or prerecorded voice that prompts the person called to indicate whether BCA Financial has called the right number. It goes something like: "If this is Jane Doe, press 1; 'if this is a wrong number,' press 2." [ECF No. 86-1, p. 6].

The phone numbers BCA Financial automatically dials are fed to the Noble system from a separate collection-software system called "FACS." FACS is loaded with phone numbers supplied by BCA Financial's healthcare clients. Those clients, in turn, received the numbers from the patients.

The parties agree that BCA Financial uses the Noble predictive dialer to autodial phone numbers without human intervention. But facts suggest that the Noble system is incapable of generating random or sequential phone numbers (and instead dials from a fixed set of numbers supplied by separate debt-collection software).

On six occasions, and twice using an IVR, BCA Financial called Reyes' cellphone using the Noble predictive dialer. It was not an emergency. Nor did BCA Financial have Reyes' prior express consent. It was trying to reach a different person who had written Reyes' cellphone number on a medical consent form. Five calls went unanswered, and on the sixth call, Reyes picked up the phone, heeded the IVR prompts, and pressed two -- for wrong number. BCA Financial did not call Reyes again after that.

Reyes now moves for summary judgment on her individual TCPA claim. [ECF No. 86]. She seeks $1,500 for each of the eight TCPA violations (i.e., treble damages for six autodialed calls and two IVR uses, the latter constituting separate TCPA violations). BCA Financial filed an opposition response, and Reyes filed a reply. [ECF Nos. 92; 95].

The parties do not dispute the basic facts of this case: BCA Financial used a predictive dialer and a prerecorded or artificial voice to call Reyes' cellphone several times without her prior express consent or an emergency. But the parties vigorously debate the question of whether the Noble predictive dialer is an ATDS. If an IVR prompted *that* question, then Reyes would press one for "yes" and BCA Financial would press two for "no."

BCA Financial argues that the Noble predictive dialer, although capable of automatically dialing a phone number without human intervention, cannot generate random or sequential phone numbers and is therefore not an ATDS. Reyes, on the other hand, argues that such capability (or lack of capability) is inconsequential. The debate touches on several orders from the Federal Communications Commission ("FCC"), whose final orders interpreting the TCPA are binding on this Court. The debate also concerns a recent D.C. Circuit opinion, *ACA International v. Federal Communications Commission*, 885 F.3d 687, 691 (D.C. Cir. 2018), which struck down the FCC's latest 2015 order interpreting the TCPA.

In addition, the parties raise two more issues. First, they disagree on whether

Reyes is entitled to treble damages. And second, BCA Financial challenges Reyes' ability to raise claims for TCPA violations involving an artificial or prerecorded voice, arguing that those claims were not pled in the Complaint.

As outlined in detail below, the Court **grants in part** and **denies in part** Reyes' summary judgment motion. First, the Court **grants** summary judgment in Reyes' favor on the ATDS issue because the Noble predictive dialer, as BCA Financial uses it, *is* an ATDS under the TCPA. Second, the Court **denies** summary judgment to Reyes on the treble-damages issue because, at least at this stage, the Court cannot determine whether BCA Financial acted willfully or knowingly. Third, the Court **denies** summary judgment to Reyes on the artificial-or-prerecorded-voice issue because her Complaint alleged only that BCA Financial violated the TCPA through the use of an ATDS, not an artificial or prerecorded voice, which is a *separate* statutory basis for relief that she should have raised in an amended pleading.

## I.    Background

### A.    *Procedural History*

Reyes brings a two-count Complaint against BCA Financial. [ECF No. 1]. The first count is for allegedly violating the TCPA. [ECF No. 1, p. 9]. The second count was for allegedly violating the Fair Debt Collection Practices Act, but Reyes later dismissed that claim. [ECF Nos. 1, pp. 9–10; 78]. Thus, the TCPA claim remains, and Reyes brings

it on behalf of herself and a proposed class of persons. [ECF No. 1].[1]

In support of her TCPA claim, Reyes alleged under her general allegations that BCA Financial "routinely violates 47 U.S.C. § 227(b)(1)(A)(iii) by using an automatic telephone dialing system to place non-emergency calls to numbers assigned to a cellular telephone service, without prior express consent." [ECF No. 1, p. 1 ¶ 2]. Reyes alleged that BCA Financial placed several calls to her cellphone when trying to collect a debt owed by someone else. [ECF No. 1, pp. 3–5 ¶¶ 16–22, 26, 28–29].

She then alleged that "in light of the frequency, number, nature, and character of the calls, Defendant placed its calls to Plaintiff's cellular telephone number by using an automatic telephone dialing system." [ECF No. 1, p. 3 ¶ 23]. Reyes then makes several more references to BCA Financial using an ATDS to call her and to call others, including proposed class members. [ECF No. 1, pp. 3–7 ¶¶ 24–25, 33, 37–38, 43, 52].

Reyes includes just one specific paragraph under her TCPA count, which reads: "Defendant violated 47 U.S.C. § 227(b)(1)(A)(iii) by using an automatic telephone dialing system to place non-emergency calls to Plaintiff's cellular telephone number, absent prior express consent." [ECF No. 1, p. 9 ¶ 74].

In neither her general allegations nor her one specific allegation that concerns the

---

[1]     Reyes has moved for class certification, and the issue is fully briefed. [ECF Nos. 59; 82; 94]. The summary judgment motion, however, deals only with her individual claim. Moreover, it concerns threshold issues that may impact the class, if it is certified. Therefore, the Court deems it prudent to rule on the summary judgment motion first.

TCPA does Reyes allege that BCA Financial called her using an artificial or prerecorded voice. The only reference to artificial or prerecorded voices is within her initial proposed TCPA class action definition, which read:

> *TCPA class*: All persons and entities throughout the United States (1) to whom BCA Financial Services, Inc., placed, or caused to be placed, calls (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system *or an artificial or prerecorded voice*, (4) within the four years preceding the date of this complaint, (5) absent prior express consent—in that the called party was not the intended recipient.

[ECF No. 1, p. 6 ¶ 44 (emphasis added)].

But in her class certification motion, Reyes edited her class action definition, **removing** any explicit reference to artificial or prerecorded voices:

> All persons and entities throughout the United States (1) to whom BCA Financial Services, Inc. placed more than one call, (2) directed to a number assigned to a cellular telephone service, but not assigned to the intended recipient of BCA Financial Services, Inc.'s calls, (3) *by using computer assisted dialing technology manufactured or designed by Noble*, (4) from September 23, 2012 through September 23, 2016.

[ECF No. 59, p. 1 (emphasis added)].

In the Complaint's wherefore clause, Reyes generally asks, among other things, that the Court declare that BCA Financial violated the TCPA. [ECF No. 1 p. 10].

BCA Financial answered the Complaint, raising several affirmative defenses. [ECF No. 8]. As its second affirmative defense, BCA Financial raised "prior express consent" and alleged that "Plaintiff's claims under the TCPA are not actionable as Defendant has established the requisite 'prior express consent' to communicate with the

Plaintiff at the telephone number provided as authorized by the Federal Communication Commission and the law of this Circuit." [ECF No. 8, p. 6]. But BCA Financial later withdrew that defense, explaining in a notice that, "[b]ased on information learned and developed through the course of discovery in this case, BCA withdraws without prejudice its Second Affirmative Defense as to the individual named . . . Reyes only, and not as to any purported class members." [ECF No. 74, p. 1].

B. *Undisputed Facts*

The parties do not dispute the majority of the underlying facts. The undisputed facts pertinent to the summary judgment motion are as follows: BCA Financial is a receivable management company operating in the medical billing industry for the recovery of past due debt. [ECF Nos. 86-1, p. 1; 93, p. 5]. In general, BCA Financial "receives accounts from its various medical or healthcare provider clients and calls the telephone number provided to the client by the patient." [ECF Nos. 93, p. 1; 96, p. 4]. BCA Financial "utilizes 'computer assisted dialing technology' manufactured and designed by Noble Systems to place telephone calls." [ECF Nos. 86-1, p. 4; 93, pp. 3, 6; 96, p. 5].

The Noble dialing system is a "predictive dialer." [ECF Nos. 86-1, pp. 4, 5; 93, p. 6]. And the Noble predictive dialer, as BCA Financial uses it, "automatically dials telephone numbers without human intervention." [ECF Nos. 86-1, p. 5; 93, p. 6].

Also, from April 2016 to September 2016, BCA Financial used the IVR capability

7

of its Noble predictive dialer to greet called persons with an automated prompt, asking them to press one key if the correct person had been called and a different key if the wrong number had been reached. [ECF Nos. 86-1, p. 4; 93, p. 6]. When an answering party selects the number indicating a wrong call during an IVR message, the FACS system automatically generates a "B" flag. [ECF Nos. 93, pp. 2–3; 96, p. 11]. And if an answering person receives a call from a BCA Financial agent and indicates that the agent has called the wrong number, the agent selects a "WN" code within the Noble system to show that this is a wrong number. [ECF Nos. 93, p. 4; 96, p. 6]. At the end of each business day, the Noble system communicates to the FACS system which numbers received a "WN" code, and the next day, the Noble system would have no phone numbers with a "B" code. [ECF Nos. 93, p. 4; 96, p. 6].

BCA Financial obtained Reyes' cellphone number from one of its clients, Barnabas Health, to collect a debt. [ECF Nos. 86-1, p. 1; 93, pp. 2, 5; 96, pp. 4, 7]. Barnabas gave BCA Financial the patient's biographical information, including the phone number, as part of the patient's medical consent documentation. [ECF Nos. 93, p. 2; 96, p. 4]. But the name Barnabas associated with the cellphone number was not Reyes'. [ECF Nos. 86-1, p. 2; 93, p. 5].

BCA Financial did not ask Barnabas if the number was accurate. [ECF Nos. 86-1, p. 1; 93, p. 5]. Barnabas did not know that the number belonged to someone other than the patient. [ECF Nos. 93, p. 5; 96, p. 7]. And so Barnabas did not inform BCA Financial

that the number belonged to someone else. [ECF Nos. 93, p. 5; 96, p. 7].

Using the Noble predictive dialer, BCA Financial placed six calls to Reyes' cellphone number. [ECF Nos. 86-1, p. 4; 93, pp. 2, 6; 96, p. 4]. Reyes did not answer the first five calls, and BCA Financial stopped calling Reyes after the sixth call. [ECF Nos. 93, p. 2; 96, p. 4]. BCA Financial never spoke to Reyes during any of the attempted communications. [ECF Nos. 93, p. 2; 96, p. 4].

BCA Financial did not intend to call Reyes but was trying to reach someone else to collect a debt. [ECF Nos. 86-1, p. 1; 93, p. 6]. Moreover, Reyes never had a business relationship with BCA Financial. [ECF Nos. 86-1, p. 2; 93, p. 5]. BCA Financial did not call Reyes' number for emergency purposes. [ECF Nos. 86-1, p. 3; 93, p. 6]. And Reyes did not provide BCA Financial with prior express consent to call her cellphone. [ECF Nos. 86-1, p. 2; 93, p. 5].

BCA Financial did not manually dial Reyes' number first to confirm the intended caller. [ECF Nos. 86-1, p. 3; 93, p. 6]. And it is not BCA Financial's policy and procedure to manually dial a telephone number before autodialing it to make sure that the person on the other end is the intended recipient. [ECF Nos. 86-1, p. 3; 93, p. 6].

At least two of BCA Financial's calls to Reyes "were accompanied by an artificial or prerecorded voice." [ECF Nos. 86-1, p. 5; 93, p. 6]. The IVR Reyes received gave a message to the following effect: "If this is Jane Doe, press 1; 'if this is a wrong number,' press 2." [ECF Nos. 86-1, p. 6; 93, p. 6]. Reyes pressed two. [ECF Nos. 86-1, p. 4; 93, p. 6].

BCA Financial maintains and makes available to all employees a TCPA Participant Guide. [ECF Nos. 86-1, p. 6; 93, p. 7]. It also trains its employees and instructs its representatives on how to notate each account and operate FACS. [ECF Nos. 93, p. 1; 96, p. 4]. And it provides training compliance for various state and federal consumer-protection laws, including the TCPA. [ECF Nos. 93, p. 1; 96, p. 4].

## II.   Analysis

### A.   *As used by BCA Financial, the Noble predictive dialer is an ATDS.*

The TCPA contains the following prohibition on the use of automated telephone equipment:

> It shall be unlawful for any person within the United States . . . :
>
> > (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--
> >
> > ......
> >
> > (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]

§ 227(b)(1)(A)(iii).

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity--(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1)(A)–

(B).

Besides authorizing injunctive relief, the TCPA grants a private right of action "to recover for actual monetary loss from . . . a [TCPA] violation, or to receive $500 in damages for each such violation, whichever is greater[.]" § 227(b)(3)(B). But "[i]f the court finds that the defendant willfully or knowingly violated [the TCPA], the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount[.]" § 227(b)(3).

The TCPA also mandates that the FCC "prescribe regulations to implement the requirements" of the TCPA. § 227(b)(2). The FCC has done so through a "series of rulemakings and declaratory rulings addressing the Act's reach." *ACA Int'l*, 885 F.3d at 693.

Pertinent here, in 2003, the FCC issued an order finding, among other things, "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014, 14,093 (2003). The 2003 FCC order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* at 14143 n. 31.

In the 2003 FCC order, the agency explained that "[m]ost industry members that

commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of 'automatic telephone dialing system,' primarily because, they contend, predictive dialers do not dial numbers 'randomly or sequentially.'" *Id.* at 14090. Instead, according to those opponents, "predictive dialers store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers." *Id.* But consumers and consumer groups, on the other hand, argued "that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference." *Id.*

The FCC sided with the consumers, finding "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *Id.* at 14093. As the FCC explained:

> The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. The principal feature of predictive dialing software is a timing function, not number storage or generation.

*Id.* at 14091 (internal citations omitted).

The FCC continued that, although "[i]n the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily," since then "the evolution of the teleservices industry has progressed to the point where using lists

of numbers is far more cost effective." 18 FCC Rcd. at 14092. And yet "[t]he basic function of such equipment . . . has not changed–the *capacity* to dial numbers without human intervention." *Id.* The FCC further reasoned that "to exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result." *Id.* at 14092.

In 2008, the FCC issued a declaratory judgment that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008). The petitioner under that ruling argued, among other things, that the FCC's "determination that predictive dialers fall within the meaning of the statutory definition of 'automated telephone dialing equipment' was incorrect and conflicts with the language of the TCPA." *Id.* at 563. The petitioner argued that the FCC erred because "debt collectors use predictive dialers to call specific numbers provided by established customers." *Id.* at 566. Therefore, according to the petitioner, "a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists." *Id.*

The FCC disagreed. It summarized and reaffirmed the findings of its 2003 order. *Id.* at 566. And it then added that the petitioner "raises no new information about

predictive dialers that warrants reconsideration of these findings." *Id.* at 566–67.

And in yet another order issued in 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15399 (2012).

The Eleventh Circuit has unequivocally held that final FCC orders are binding on district courts and that district courts "may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation[.]" *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015) (citing *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1114 (11th Cir. 2014)). That is because "[t]he Communications Act, which the TCPA amended, provides that any 'proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] must be brought under the Hobbs Act." *Id.* at 1306 (quoting 47 U.S.C. § 402(a)). And "[t]he Hobbs Act provides the federal courts of appeals with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity' of FCC orders." *Id.* at 1306–07 (quoting 28 U.S.C. § 2342(1)). Therefore, "[i]f the Hobbs Act applies, a district court must afford FCC final orders deference and may only consider whether the alleged action violates FCC rules or regulations." *Id.* at 1307.

By way of example, in *Mais*, the Eleventh Circuit reversed a district court decision that refused to apply the 2008 FCC Order's interpretation of prior express consent. 768 F.3d at 1113. Similar to the present case, the plaintiff in *Mais* owed a debt to a medical provider, and when he did not pay, the provider's billing company forwarded the account to a third-party "debt collector that uses a predictive dialer to dial telephone numbers through automated technology." *Id.* at 1114. The debt collector then called the plaintiff's cellphone several times using the predictive dialer and placed similar calls to putative class members. *Id.*

Before the district court considered certifying the class, the defendants had moved for summary judgment on their affirmative defense of prior express consent, arguing that the plaintiff's wife gave such consent when she wrote his cellphone number on the hospital admission forms. *Id.* at 1115. The defendants relied on a portion of the 2008 FCC order which stated that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *Id.* (quoting 23 FCC Rcd. at 564).

The district court sided with the plaintiff, finding that "the Federal Communication Commission's interpretation of 'prior express consent' embodied in its 2008 rule was not entitled to any deference because it conflicted with the clear meaning of the TCPA." *Id.* But the Eleventh Circuit reversed the ruling, holding that the district

court had "exceeded its jurisdiction by declaring the 2008 FCC Ruling to be inconsistent with the TCPA." *Id.* at 1119. As part of its reasoning, the Eleventh Circuit explained that, "[w]hichever way it is done, to ask the district court to decide whether the regulations are valid violates the statutory requirements [of the Hobbs Act]." *Id.* at 1120.

On the other side of the coin, in *Murphy*, the Eleventh Circuit *affirmed* a dismissal order where the district court "concluded that it lacked jurisdiction under the Hobbs Act to consider [the] argument that the [FCC] incorrectly interpreted 'prior express consent' in its initial rulemaking following the TCPA's passage." 797 F.3d at 1305. After discussing the 2008 FCC order, which reiterated a 1992 FCC order on the same issue, the Eleventh Circuit held that the "argument that prior express consent must be given its plain language meaning fails because it requires rejection of the FCC's interpretation of prior express consent in FCC orders." *Id.* at 1307–08; *see also Lawrence v. Bayview Loan Servicing, LLC*, 666 F. App'x. 875, 878 (11th Cir. 2016) (relying on *Murphy* and *Mais* when explaining: "The meaning of prior express consent has been further clarified both by our own precedent and by the FCC, whose rulings have the force of law.").

Based on the FCC's orders on predictive dialers, several Florida district courts have found that predictive dialers qualify as ATDSs as a matter of law, and one of those cases even involved the Noble predictive dialer at issue here. *See Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016) (citing the 2003 FCC order for the proposition that "[a] predictive dialer constitutes an ATDS within the meaning of the

TCPA" and then holding that, as to some calls, the debt collector defendant was liable as a matter of law due to its use of the Noble predictive dialer); *see also Patterson v. Ally Fin., Inc.*, No. 3:16-CV-1592-J-32JBT, 2018 WL 647438, at *2 (M.D. Fla. Jan. 31, 2018) (on summary judgment, rejecting defendant's argument that its predictive-dialing system did not qualify as an ATDS, because the FCC "has consistently held that predictive-dialing technologies are equivalent to ATDSs"); *c.f. Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1374 (S.D. Fla. 2014) (explaining that "the FCC determined that a predictive dialer is an ATDS" and also collecting cases that have interpreted more broadly "the FCC's reasoning that the defining characteristic of an ATDS is the 'capacity to dial numbers without human intervention'").

Of those cases, *Strauss* warrants further discussion because it involved different uses of the Noble predictive dialer at issue here. In the first instance, the defendant simply "placed its first two calls to Plaintiff using a Noble Systems Predictive Dialer[.]" *Strauss*, 173 F. Supp. 3d at 1307. But then the defendant "placed the remaining 24 calls to Plaintiff using [its] Manual Clicker Application ('MCA')," which required an agent to "manually initiate the call by clicking a computer mouse or pressing a keyboard enter key," and the "MCA then use[d] a Noble Systems device to connect the call to a telephone carriers' network." *Id.*

Based on the 2003 FCC order, the *Strauss* Court readily entered summary judgment in the plaintiff's favor as to the first two calls, reasoning as follows:

> Plaintiff has proven all of the necessary elements for his TCPA claims against [the defendant] for the calls placed on April 14 and April 15, 2014. As noted above, [the defendant] does not contest that it used the Noble Systems Predictive Dialer to place its first two calls to Plaintiff's cell phone. A predictive dialer is clearly an ATDS within the meaning of the TCPA. 2003 FCC Order ¶ 133. And there is no evidence to suggest that the calls were made with Plaintiff's consent or for emergency purposes.

*Id.* at 1309.

But as to the remaining 24 calls, the *Strauss* Court granted summary judgment in the **defendant's** favor. *Id.* at 1310–11. The parties had agreed "that the MCA, by itself, lacks the capability to dial predictively." *Id.* at 1310. And the defendant also "presented substantial evidence that human intervention is essential at the point and time that the number is dialed using the MCA and that the Noble equipment used does not have the functionalities required to classify it as a predictive dialer." *Id.* at 1310–11. Therefore, the Court concluded that the defendant did not use an ATDS for those 24 calls. *Id.* at 1311.

In 2015, the FCC issued another declaratory ruling that again touched on predictive dialers. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015). Earlier this year, the D.C. Circuit struck down portions of that 2015 order. Pertinent here, there were two appellate issues related to ATDSs: (1) *when* does a device have to have the "capacity" to perform the two functions that define an ATDS -- i.e., "(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers" -- and (2) what functions are needed precisely. *ACA Int'l*, 885 F.3d at 695.

Concerning the first issue, in its 2015 order, the FCC "rejected the arguments of various parties that a device's capacity must be measured solely by reference to its 'present capacity' or its 'current configuration' without any modification," and "instead determined that the 'capacity' of calling equipment 'includes its potential functionalities' or 'future possibility,' not just its 'present ability.'" *Id.* The D.C. Circuit set aside that finding, reasoning that the FCC "adopted an expansive interpretation of 'capacity' having the apparent effect of embracing any and all smartphones" because "[i]t is undisputed that essentially any smartphone, with the addition of software, can gain the statutorily enumerated features of an autodialer and thus function as an ATDS." *Id.* at 696. Thus, the D.C. Circuit concluded, "[t]hat interpretation of the statute . . . is an unreasonably, and impermissibly, expansive one." *Id.* at 700.

Concerning the second issue, the D.C. Circuit first addressed the FCC's threshold argument that the Court "lack[ed] jurisdiction to entertain petitioners' challenge concerning the functions a device must be able to perform" in light of "declaratory rulings in 2003 and 2008 concluding that the statutory definition of an ATDS includes 'predictive dialers[.]'" *Id.* at 701. The D.C. Circuit disagreed, holding that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent pronouncements from review." *Id.* The D.C. Circuit reasoned that "[t]he agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform," doubts which the FCC sought to clarify,

and therefore the Court had jurisdiction to review those clarifications. *Id.*

After its review, the D.C. Circuit concluded that the 2015 FCC order "falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *Id.* For instance, on the question of "whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the FCC was "of two minds on the issue." *Id.* at 701.

Specifically, the D.C. Circuit explained that "[w]hile the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity." *Id.* at 702. On that issue, the FCC reaffirmed its 2003 order, in which it had "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *Id.* at 702.

The D.C. Circuit did not reject one view or the other. Rather, it recognized that *either* interpretation might be permissible but disapproved the FCC's Janus-like approach:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it

lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). **It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order**.

*Id.* at 702–03 (emphasis added).

In a different example of improper rulemaking, the D.C. Circuit noted that although the FCC had consistently stated "that the 'basic function' of an autodialer is the ability to 'dial numbers without human intervention,'" it "nevertheless declined a request to 'clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.'" *Id.* at 703 (quoting 30 FCC Rcd. at 7973, 7975–76). The D.C. Circuit concluded that "[t]hose side-by-side propositions are difficult to square" -- i.e., that a device may be an autodialer even if it dials numbers with human intervention even though the "basic function of an autodialer is to dial numbers without human intervention." *Id.* at 703.

Summarizing its decision, the D.C. Circuit succinctly concluded that:

the Commission's ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters.

*Id.* at 703.

At least one district court has since relied on the D.C. Circuit's opinion to find

that a predictive dialer is not an ATDS. *Marshall v. CBE Grp., Inc.*, No. 216CV02406GMNNJK, 2018 WL 1567852, at **4–8 (D. Nev. Mar. 30, 2018). The *Marshall* case involved the **same defendant** that was sued in *Strauss*: CBE Group, Inc. That fact is important because, as it did in *Strauss*, the defendant in *Marshall* used a manual clicker application or "MCA" in conjunction with a predictive dialer. That use of the MCA was key in the *Marshall* decision, as it was in the *Strauss* decision, and thus key to our analysis here.

The *Marshall* first reasoned that, in light of the D.C. Circuit opinion, it would "not stray from the statute's language which mandates that the focus be on whether the equipment has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." *Id.* at *5 (internal quotations omitted). The *Marshall* Court then rejected the plaintiff's argument that the FCC's previous orders defined predictive dialers as ATDSs, reasoning that "the D.C. Circuit explicitly rejected this 'expansive' interpretation of the TCPA, particularly as that definition pertained to systems that may not, in fact, have the capacity to dial randomly or sequentially." *Id.* at *7.

The plaintiff then argued "that notwithstanding the *ACA Int'l* ruling, the 2015 FCC Order, as well as the 2003 FCC Order, remains binding on this Court." *Id.* The *Marshall* Court, however, skirted that argument, reasoning instead that "[e]ven assuming, *arguendo*, that Plaintiff is correct, these interpretations have repeatedly

emphasized the significance of the 'human intervention' element to the ATDS analysis." *Id.* And on that front, the *Marshall* Court found "that the overwhelming weight of authority applying this element hold that 'point-and-click' dialing systems, paired with a cloud-based pass-through services, do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention." *Id.* (citing, *inter alia*, *Strauss*, 173 F. Supp. 3d at 1310–11).

Moving to the case at hand, it is fair to say that before the 2015 FCC Order and the *ACA International* ruling, the Noble predictive dialer, as used by BCA Financial, is an ATDS as a matter of law. The FCC has consistently held that predictive dialers constitute ATDSs, their basic function being that they can dial persons without human intervention regardless of whether called numbers are generated randomly or sequentially or from a set list. The Eleventh Circuit has held that final FCC orders are binding on this Court, thus barring me from "refusing to enforce an FCC interpretation." *Murphy*, 797 F.3d at 1307; *see also Mais*, 768 F.3d at 1114. Based on that binding authority, other judges have found that predictive dialers constitute ATDSs, including the Noble predictive dialer at issue here. *See, e.g., Strauss*, 173 F. Supp. 3d at 1309.

In this case, it is undisputed that the Noble dialing system is a "predictive dialer." [ECF Nos. 86-1, pp. 4, 5; 93, p. 6]. And it is also undisputed that, regardless of how the numbers it dials are teed up, the Noble predictive dialer, as BCA Financial uses

it, "automatically dials telephone numbers without human intervention." [ECF Nos. 86-1, p. 5; 93, p. 6]. Thus, binding authority would compel me to find that the Noble predictive dialer is an ATDS. And I would have to reach that conclusion regardless of whether I agree with the FCC interpretation of the TCPA's statutory language. *See Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) ("[I]f tasked with applying only the statute's language, I would conclude that Yahoo!'s system does not constitute an ATDS because the PC2SMS service does not use a random or sequential number generator. Nevertheless, the TCPA and Hobbs Act bind me to the FCC's interpretation.").

Indeed, BCA Financial's opposition response, filed while *ACA International* was still pending, was, for all practical purposes, resigned to that conclusion. Here is how it put it:

> Since the statute's [the TCPA's] passage in 1991, the FCC has issued regulations **expanding the statutory definition of an ATDS**, and **this Court is bound by those rulings under the Hobbs Act**. In 2003, the FCC was asked to determine whether predictive dialers fell within the scope of the TCPA's definition of automatic dialers and it concluded that **they did because they retained the same basic function—namely, "the capacity to dial numbers without human intervention." The FCC affirmed this decision in 2008**. In 2012, the FCC again revisited the definition of an ATDS and explained that the Commission has emphasized that the term ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention **regardless of whether the numbers called are randomly or sequentially generated or come from calling lists**."

[ECF No. 92, pp. 6–7].

BCA Financial then argued that "[a]lthough it may be factually undisputed and determined that the Noble Dialer is a 'predictive dialer', the issue of whether a 'predictive dialer' satisfied the TCPA's definition of an ATDS has yet to be conclusively determined by the D.C. Circuit in the *ACA International* case." [ECF No. 92, p. 9]. Thus, BCA Financial continued, "[i]n the absence of demonstrating that, as a matter of law, a predictive dialer is the legal equivalent of an ATDS, Plaintiff's Motion of Summary Judgment should be denied." [ECF No. 92, p. 9].

So the *ACA International* case has given the Court considerable pause. But the Court finds that the prior FCC Orders are still binding. Therefore, the *ACA International* case does not change the Court's conclusion on the ATDS issue.

To be sure, the Court does not challenge the notion that *ACA International* is binding authority, even though it comes from the D.C. Circuit and even though there is a split of authority on this issue. *See, e.g., Zuluaga v. Ocwen Loan Servicing, LLC*, No. 617CV335ORL37GJK, 2017 WL 1684127, at *1 (M.D. Fla. May 3, 2017) (noting the split in authority without making a decision). But the Court here adopts the "binding" position because, as one Court succinctly put it, "[w]here several challenges to a final order arise across several jurisdictions, those are consolidated in one circuit, whose decision becomes binding on all circuits." *Jacobs v. Ocwen Loan Servicing, LLC*, No. 16-62318-CIV, 2017 WL 1733855, at *1 (S.D. Fla. Apr. 14, 2017) (citing *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008)). The *ACA International* appeal was a consolidated appeal

from several Circuits, so its decision is binding here. *Id.*

Still, BCA Financial reads too much into *ACA International* when it concludes that the prior FCC orders can no longer be relied upon. The Court rejects that argument for several reasons. First, nowhere in the D.C. Circuit's opinion are the prior FCC orders overruled. Indeed, that would have been impossible given that the time to appeal those orders had long passed. And when addressing those prior orders, the D.C. Circuit merely said that it had jurisdiction to address the recent pronouncements and clarifications issued in 2015, not whether the 2003 and 2008 orders remained valid.

Second, when the D.C. Circuit said that the FCC had provided too expansive an interpretation of the TCPA, the D.C. Circuit was not referring to the prior or recent rulings equating predictive dialers to ATDSs. Rather, the D.C. Circuit was referring to the FCC's interpretation of the TCPA as encompassing devices that have both the present and *future* capacity to acts as ATDSs. That future- or potential-capacity interpretation was problematic because it had "the apparent effect of embracing any and all smartphones" given that "essentially any smartphone, with the addition of software, can gain the statutorily enumerated features of an autodialer and thus function as an ATDS." *ACA Int'l*, 885 F.3d at 696.

In this case, however, there is no issue concerning the Noble predictive dialer's present versus future capacity. Although BCA Financial disputes that the Noble predictive dialer is an ATDS, the issue is not whether BCA Financial may *later* convert it

into an ATDS. That is not Reyes' theory of liability. Rather, it is that the Noble predictive dialer *is* an ATDS as *currently* configured and utilized. Therefore, the 2015 FCC order concerning present versus future capacity would not have had an impact in this case anyway, let alone *ACA International's* decision concerning that issue.

Third, although *ACA International's* rulings concerning a device's ability to generate random or sequential numbers and the need for human intervention hit closer to home, they still do not warrant denial of summary judgment in this case. To understand why, one must focus on not just what *ACA International* did but on what it did **not** do.

Specifically, what *ACA International* did was to reject the FCC's have-your-cake-and-eat-it-too approach to the questions before it. The FCC was of "two minds on the issue" of whether "a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer," or whether "that equipment can meet the statutory definition even if it lacks that capacity." *Id.* at 701–02. The FCC answered "yes" and "yes," i.e., it *must have* that ability and it *may lack* that ability, two conflicting answers that the D.C. Circuit could not accept because it provided no meaningful guidance.

But what *ACA International* did **not** do is endorse one interpretation over the other, even implicitly. *ACA International* did not say that a predictive dialer, or any other type of device, must be able to generate and dial random or sequential numbers to meet

the TCPA's definition of an autodialer. Nor did it say that a predictive dialer, or any other type of device, may lack that capacity. In fact, the D.C. Circuit said that "[i]t might be permissible for the Commission to adopt **either interpretation.**" *ACA Int'l*, 885 F.3d at 703 (emphasis added). But what the FCC could not do was "espouse both competing interpretations in the same order." *Id.*

In this case, BCA Financial is essentially urging the Court to adopt the first interpretation -- i.e., that a predictive dialer must be able to generate and dial random or sequential numbers to be an ATDS -- based on *ACA International's* authority. But *ACA International* does not compel that conclusion because it did not adopt that interpretation. At best, *ACA International* arguably calls into doubt the FCC's previous broad statements that predictive dialers are ATDSs regardless of whether they call randomly or from a sequential list or a set list of numbers. But perhaps not, given that the D.C. Circuit did not adopt one interpretation over the other. In any event, as already explained, absent an express rejection of the prior FCC orders, the Court cannot deviate from them and impose my own interpretation of the TCPA.

Concerning the human-intervention issue, the D.C. Circuit's rulings on that issue are of even lesser consequence. BCA Financial does not dispute that its Noble predictive dialer "automatically dials telephone numbers *without* human intervention." [ECF Nos. 86-1, p. 5; 93, p. 6 (emphasis added)]. Therefore, it is of no moment in this case whether a device may still qualify as an ATDS "even if it cannot dial numbers without human

intervention," which is what the FCC refused to clarify. *ACA Int'l*, 885 F.3d at 703.

In addition, the Court does not find that *Marshall* warrants a different result. The *Marshall* Court did not squarely address whether the 2003 FCC Order remained binding. *See Marshall*, 2018 WL 1567852, at *7. Instead, it reasoned that, even if it remained binding, the plaintiff would still lose because "the overwhelming weight of authority" that looked at point-and-click systems **before** *ACA International* found "that 'point-and-click' dialing systems, paired with a cloud-based pass-through services, do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention." *Id.* (citing, *inter alia*, Strauss, 173 F. Supp. 3d at 1310–11).

Other district courts have indeed refused to equate predictive dialers to ATDSs where there was human intervention present in the making of calls, particularly through the use of point-and-click systems. *See Manuel v. NRA Grp., LLC*, 200 F. Supp. 3d 495, 501–02 (M.D. Pa. 2016), *aff'd*, 2018 WL 388622 (3d Cir. Jan. 12, 2018) (explaining that "'[p]oint and click' systems requiring users to manually initiate each call uniformly necessitate human involvement," while "dialers with the capacity to initiate multifarious calls prospectively, before agents become available, fall within the ambit of the [TCPA]," and then holding that the predictive dialer at issue **was** an ATDS because "uncontroverted evidence establishes that [it] is capable of placing calls without human intervention"); *Estrella v. Ltd Fin. Servs., LP*, No. 8:14-CV-2624-T-27AEP, 2015 WL 6742062, at *3 (M.D. Fla. Nov. 2, 2015) (granting summary judgment in the defendant's

favor where there was "no evidence that Defendant used . . . predictive dialing systems to place calls to Plaintiff[']s cellular phone," but instead, "the evidence demonstrates, at most, that the calls were placed manually with the use of human intervention through a 'point and click function'"); *see also Wilcox v. Green Tree Servicing, LLC*, No. 8:14-CV-1681-T-24, 2015 WL 2092671, at *5 (M.D. Fla. May 5, 2015) (denying summary judgment seeking to hold predictive dialer as an ATDS because "[t]he evidence before the Court is somewhat vague regarding how the phone calls are initiated," explaining that "[i]f the agent selects the number to be called, then the call would be made as a result of human intervention, and the call would not be made using an ATDS.").

The human element present in *Marshall* readily distinguishes that case from the present case. Here, BCA Financial has presented no facts or evidence that it used a manual-clicker application or point-and-click function or similar human-intermediary utility before placing a call using the Noble predictive dialer. Quite the opposite, BCA Financial **admits** that "the Noble dialer, as Defendant uses it, automatically dials telephone numbers **without human intervention**." [ECF Nos. 86-1, p. 5; 93, p. 6 (emphasis added)].

In sum, the Court **grants** summary judgment in Reyes' favor on the ATDS issue, finding that the Noble predictive dialer, as used by BCA Financial, was an ATDS as a matter of law.

**B.** *Whether BCA Financial acted willfully or knowingly is an issue for trial.*

Recall that "[i]f the court finds that the defendant willfully or knowingly violated [the TCPA], the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount[.]" § 227(b)(3). Rather than decide the willfully-or-knowingly issue on summary judgment, several courts have left the issue for trial. *See McCaskill v. Navient Sols., Inc.*, 178 F. Supp. 3d 1281, 1295 (M.D. Fla. 2016); *Manuel*, 200 F. Supp. 3d at 502–03; *Hines v. CMRE Fin. Servs., Inc.*, No. 13-61616-CIV, 2014 WL 105224, at *5 (S.D. Fla. Jan. 10, 2014), *amended in other respects*, 2014 WL 11696706 (S.D. Fla. Jan. 23, 2014). The Court follows that approach here.

At this point, the evidence does not unequivocally show that BCA willfully or knowingly violated the TCPA as a matter of law. If anything, the evidence shows the opposite -- that the calls were *unintentional*. The parties agree that BCA Financial did not intend to call Reyes but was trying to reach someone else to collect a debt. [ECF Nos. 86-1, p. 1; 93, p. 6]. BCA Financial obtained Reyes' cellphone number from one of its clients, Barnabas, who associated that number with a former patient (based on what the patient wrote on certain medical forms). [ECF Nos. 86-1, pp. 1–2; 93, pp. 2, 5; 96, pp. 4, 7]. And Barnabas did not inform BCA Financial that the number belonged to someone other than the patient. [ECF Nos. 93, p. 5; 96, p. 7].

It is true that BCA Financial did not ask Barnabas if the number was accurate. [ECF Nos. 86-1, p. 1; 93, p. 5]. But then again, Barnabas did not know that the number

belonged to someone else. [ECF Nos. 93, p. 5; 96, p. 7]. So a jury may deem BCA Financial's lack of follow-up inconsequential because Barnabas would likely not have told BCA Financial that the phone information was incorrect.

Moreover, the parties agree on the fact that after the sixth call, when Reyes indicated to an IVR message that BCA Financial had dialed the wrong number, BCA Financial stopped calling. [ECF Nos. 93, p. 2; 96, p. 4]. That would indicate that BCA Financial did not intend to call her cellphone once it *knew* that it had the wrong number. To be sure, BCA Financial could have manually called Reyes to verify the number, a step that it did not take because it was contrary to their mode of operation. [ECF Nos. 86-1, p. 3; 93, p. 6]. But that is but another omission for the jury to weigh.

Lastly, the parties agree that BCA Financial at least *tried* to be TCPA compliant: it maintains a TCPA Participant Guide that it makes available to all employees; instructs its representatives on how to notate each account and operate its collection software; and provides compliance training for the TCPA. [ECF Nos. 86-1, pp. 1, 6; 93, pp. 1, 7; 96, p. 4]. A jury might review that evidence and decide that BCA Financial did not knowingly or willingly call an unknown person's cellphone without permission. Or the jury might assess that evidence and conclude that BCA Financial should have known better or that its training and compliance are surely lacking.

In short, based on the record as it stands, the Court **denies** summary judgment in Reyes' favor on the issue of treble damages.

**C.** **BCA Financial's use of the IVR cannot form a basis for summary judgment because it is an unpled claim.**

"Although the Supreme Court has mandated liberal pleading standards for civil complaints, the standard 'does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.'" *Newman v. Ormond*, 396 F. App'x 636, 639 (11th Cir. 2010). Thus, as opposed to simply raising additional *facts* in support of an already pled claim, a plaintiff on summary judgment cannot raise "an additional, separate statutory basis" for relief. *Hurlbert v. St. Mary's Health Care Sys.*, Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).

For instance, in *Hurlbert*, the plaintiff had alleged in his complaint that he was entitled to FMLA leave based on *his* illness, but on summary judgment, he alleged that he was entitled to leave to take care of his sick mother. *Id.* The plaintiff argued that the general rule prohibiting him from raising new claims on summary judgment was "inapplicable, because his allegations about his mother do not raise a new 'claim,' and are merely additional facts asserted in support of the interference claim already pled in his complaint." *Id.* The Eleventh Circuit disagreed, explaining that "the subsequent assertion of an additional, separate statutory basis for entitlement to leave" was "a fundamental change in the nature of [the] interference claim." *Id.* Thus, the Court continued, "[h]aving proceeded through discovery without amending (or seeking to amend) his complaint to reflect that fundamental change, [the plaintiff] was not entitled to raise it in the midst of summary judgment." *Id.*

In this case, Reyes' Complaint repeatedly alleged that BCA Financial violated the TCPA by using an *automatic telephone dialing system*. [ECF No. 1, pp. 1, 3–7 ¶¶ 2, 24–25, 33, 37–38, 43, 52]. In the one specific allegation within her TCPA count, she likewise alleged that BCA Financial violated the TCPA "by using an **automatic telephone dialing system** to place non-emergency calls to Plaintiff's cellular telephone number, absent prior express consent." [ECF No. 1, p. 9 ¶ 74 (emphasis added)]. Nowhere does she allege that BCA Financial called her using an artificial or prerecorded voice.

Notably, in its briefing, Reyes could point to just two parts in the Complaint in support of her argument that the Complaint encompasses a claim for the use of an artificial or prerecorded voice. First, she points to her *original* class definition, which broadly includes violations for "using an automatic telephone dialing system *or an artificial or prerecorded voice*." [ECF No. 1, p. 6 ¶ 44 (emphasis added)]. But Reyes has since *changed* that class definition, removing any reference to artificial or prerecorded voices. [ECF No. 59, p. 1]. So even assuming that the initial, all-encompassing, generic class definition provided sufficient notice of her individual claim -- an implicit assumption that the Court does not accept -- the definition has since changed.

Second, Reyes points to her wherefore clause, which asks for, among other things, that the Court adjudge and declare that BCA Financial violated the TCPA. [ECF No. 1 p. 10]. But that is just a general prayer for relief and not a specific claim. The liberality granted to pleadings does not extend *that* far. If it did, then a plaintiff could

generally include a prayer that a defendant violated a statute and then seek summary judgment on any number of unpled theories and additional facts affording relief.

Moreover, BCA Financial's use of an artificial or prerecorded voice (in the form of an IVR) cannot be deemed to be an additional fact in support of an existing TCPA claim. As Reyes herself recognized, the use of the IVR provides a separate basis for relief with its *own* set of damages. [ECF No. 96, p. 4]. It is thus "an additional, separate statutory basis" for relief. *Hurlbert*, 439 F.3d at 1297.

It is obvious that the discovery in this case changed the factual understandings held by Reyes and BCA Financial. That being the case, however, Reyes should have amended her Complaint to allege the additional basis for statutory relief -- BCA Financial's use of an ATDS *and* its use of an artificial or prerecorded voice. Consequently, "[h]aving proceeded through discovery without amending (or seeking to amend) [her] Complaint to reflect that fundamental change, [Reyes is] not entitled to raise it in the midst of summary judgment." *Id.*

In short, the Court **denies** Reyes' summary judgment motion on the two claims that seek damages for BCA Financial's use of an artificial or prerecorded voice issue.

**DONE and ORDERED** in Chambers in Miami, Florida, on May 14, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
All counsel of record