# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-24077-CIV-GOODMAN
### [CONSENT CASE]

ESTRELLITA REYES,

     Plaintiff,

v.

BCA FINANCIAL SERVICES, INC.,

     Defendant.

_____/

## OMNIBUS ORDER ON MOTION TO CERTIFY CLASS AND *DAUBERT* MOTIONS

Plaintiff Estrellita Reyes,[1] individually and on behalf of others similarly situated, has sued Defendant BCA Financial Services, Inc. for allegedly violating the Telephone Consumer Protection Act (the "TCPA"). The TCPA prohibits, among other things, the use of an "automatic telephone dialing system" ("ATDS") or an artificial or prerecorded voice to call a person's cellphone absent an emergency or prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). Each TCPA violation results in damages of not less than $500, which may be trebled for willful or knowing violations. § 227(b)(3)(B)–(C).

BCA collects debts for healthcare companies. It does so using a "predictive dialer" maintained by Noble Systems. The phone numbers BCA calls using the Noble

---

[1]     Plaintiff changed her surname from Reyes to Vazquez after she filed the lawsuit.

predictive dialer are fed into the Noble system from a separate collections software called "FACS." FACS is loaded with phone numbers supplied by BCA's healthcare clients, which received the numbers from the patients.

At times, BCA would also accompany some calls with an "interactive voice response" ("IVR"). The IVR is an artificial or prerecorded voice that prompted the person called to indicate, by pressing certain buttons, whether BCA had called the right person. It went something like: "If this is Jane Doe, press 1; 'if this is a wrong number,' press 2." [ECF No. 86-1, p. 6].

When a call recipient pressed "2" (for wrong number), the FACS system automatically generated a "B" flag in the call records next to that phone number. Similar, if a call recipient received a call from a live agent and indicated that the agent had called the wrong number, then the agent selected a "WN" code within the Noble system to show that this is a wrong number. BCA would not call those numbers again.

Reyes claims that BCA, while trying to collect debts owed by certain persons, used an ATDS to call her cellphone and those of many other potential class members. But the persons called, including her, were not the intended recipients of the calls, and therefore did not consent to be called. Stated simply, Reyes contends that BCA automatically dialed many wrong cellphone numbers, without consent or an emergency purpose, in violation of the TCPA.

Reyes now moves to certify the class under Federal Rule of Civil Procedure 23.

[ECF No. 59]. The proposed class definition in the motion was as follows:

> All persons and entities throughout the United States (1) to whom BCA
> Financial Services, Inc. placed more than one call, (2) directed to a number
> assigned to a cellular telephone service, but not assigned to the intended
> recipient of BCA Financial Services, Inc.'s calls, (3) by using computer
> assisted dialing technology manufactured or designed by Noble, (4) from
> September 23, 2012 through September 23, 2016.

[ECF No. 59]. BCA filed an opposition response, and Reyes filed a reply. [ECF Nos. 82; 94].

The parties then filed supplementary memoranda following the Court's discovery rulings. [ECF Nos. 112; 116–17]. In her supplemental brief, Reyes noted that the "more than one call" limitation in her proposed class definition is no longer necessary because the TCPA no longer contains a "one-call safe harbor." [ECF No. 112, p. 4 n.4]. And Reyes also stated in that brief, for the first time, that "this Court can properly certify a class of all persons to whom Defendant delivered a prerecorded message from April through September 2016." [ECF No. 112, p. 6].

BCA opposes class certification on several grounds. First, BCA argues that the proposed class is not readily ascertainable because the process of identifying class members is not "administratively feasible." As part of this argument, BCA challenges the opinion of Reyes' class-administration expert, Anya Verkhovskaya. BCA also presents its own rebuttal expert, Jan Kostyun, to discredit Verkhovskaya's opinion.

Second, BCA argues that Reyes has not established the predominance prong of class certification. BCA submits that many issues require individual proof and are thus

not susceptible to class treatment, such as (a) which called parties gave consent and (b) whether a called number belonged to a cellphone at the time.

Third, BCA argues that Reyes has not established the superiority prong of class certification. According to BCA, a class action is not superior to individual claims in this case because the potential class members have not suffered real damages, but BCA could be bankrupted if exposed to a multi-million dollar judgment.

Fourth, BCA argues that Reyes has defined an impermissible "fail-safe" class because being a class member automatically entitles that member to relief. And in addition, BCA objects to Reyes amending her class definition to include any claims arising from the use of an artificial or prerecorded voice, because that claim was not alleged in the complaint and likewise was not raised in the class-certification motion.

Finally, the parties seek to *Daubertize*[2] the other side's expert -- an informal term lawyers sometimes use when referring to efforts designed to exclude the other side from offering expert-witness testimony at trial. In this case, the *Daubert* motions concern the class-certification motion, and, in particular, the experts' opinions on how potential class members are identified and how cellphone data is discerned.

For the reasons outlined below, the Court **denies without prejudice** the motion to strike Verkhovskaya's expert testimony, **grants in part** and **denies in part** the motion to certify class, and **denies as moot** the motion to strike Kostyun's expert testimony.

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

First, the Court finds that Verkhovskaya's opinion testimony is admissible under *Daubert* for the purpose for class-certification purposes. But this ruling does not preclude BCA from challenging any opinion Verkhovskaya may give at trial.

Second, the Court finds that the proposed class is ascertainable and administratively feasible and that the proposed class meets the requirements of Rule 23(b)(3). The Court also rejects the argument that the class definition creates an impermissible fail-safe class. Moreover, the Court will amend the class definition to remove the no-longer-viable "more than one call" limitation.

The Court, however, denies the motion to certify class to the extent that it includes claims arising from the use of a prerecorded or artificial voice. Reyes did not plead that claim in the Complaint, she never amended the Complaint to add that claim, and that claim was not raised as a basis for class certification in the class-certification motion, even though it could have been.

Third, given the ruling on class certification, the Court need not rule on the admissibility of Kostyun's expert testimony, which, for all practical purposes, is a rebuttal to Verkhovskaya's expert testimony (and furthers the effort to strike Verkhovskaya's opinions). But Reyes may seek to challenge Kostyun's expert testimony at trial.[3]

---

[3]    Reyes submitted a declaration from Verkhovskaya in support of her motion to

# I.     Background

## A.     *Procedural History*

Reyes filed a class-action Complaint against BCA for allegedly violating the TCPA. [ECF No. 1, p. 9].[4] Reyes claimed that BCA "violated 47 U.S.C. § 227(b)(1)(A)(iii) by using an automatic telephone dialing system to place non-emergency calls to Plaintiff's cellular telephone number, absent prior express consent." [ECF No. 1, p. 9 ¶ 74]. Reyes also alleged that BCA used an ATDS to call many potential class members. [ECF No. 1, pp. 6–9].

In her Complaint, she proposed the following TCPA class:

> All persons and entities throughout the United States (1) to whom BCA Financial Services, Inc., placed, or caused to be placed, calls (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system or an artificial or prerecorded voice, (4) within the four years preceding the date of this complaint, (5) absent prior express consent—in that the called party was not the intended recipient.

[ECF No. 1, p. 6 ¶ 44].

Reyes then moved to certify her TCPA class. [ECF No. 59]. In her motion, Reyes amended her proposed class definition to read as follows:

> All persons and entities throughout the United States (1) to whom BCA Financial Services, Inc. placed more than one call, (2) directed to a number assigned to a cellular telephone service, but not assigned to the intended

---

exclude Kostyun's expert witness testimony. [ECF No. 88-2].

[4]     Reyes had also sued BCA for allegedly violating the Fair Debt Collection Practices Act, but she later dismissed that claim. [ECF Nos. 1, pp. 9–10; 78].

recipient of BCA Financial Services, Inc.'s calls, (3) by using computer assisted dialing technology manufactured or designed by Noble, (4) from September 23, 2012 through September 23, 2016.

[ECF No. 59].

BCA filed an opposition response to class certification, and Reyes filed a reply. [ECF Nos. 82; 94]. The parties also filed cross-*Daubert* motions, and those motions were fully briefed. [ECF Nos. 88; 90; 97–100]. Then, following a series of discovery rulings concerning BCA's call records, the parties filed supplemental briefing on class certification. [ECF Nos. 112; 116–17].

In addition, Reyes moved for summary judgment on her individual TCPA claim. [ECF No. 86]. She presented three issues to the Court: (1) whether the Noble predictive dialer used by BCA meets the definition of an ATDS; (2) whether Reyes is entitled to treble damages; and (3) whether Reyes could raise claims for TCPA violations involving an artificial or prerecorded voice where those claims were not pled in the Complaint.

Because it concerned several threshold issues, the Court took up the summary judgment motion first, granting it in part and denying it in part. [ECF No. 124]. First, the Court granted summary judgment in Reyes' favor on the ATDS issue, finding that the Noble predictive dialer, as BCA used it, qualifies as an ATDS under the TCPA. Second, the Court denied summary judgment to Reyes on the treble-damages issue because, at least at the summary-judgment stage, the Court could not determine whether BCA acted willfully or knowingly. Third, the Court denied summary judgment

to Reyes on the artificial-or-prerecorded-voice issue because the Complaint alleged only that BCA violated the TCPA through the use of an ATDS, not an artificial or prerecorded voice, which is a separate statutory basis for relief that she should have raised in an amended pleading.

**B.** *Factual Background*

In the summary-judgment briefing, the parties did not dispute the majority of the underlying facts. Some of those undisputed facts are pertinent to the class-certification issues presently at hand; the parties rely on those facts in their class-certification memoranda. So they are set forth below.

BCA is a receivable management company operating in the medical billing industry for the recovery of past due debt. [ECF Nos. 86-1, p. 1; 93, p. 5]. In general, BCA "receives accounts from its various medical or healthcare provider clients and calls the telephone number provided to the client by the patient." [ECF Nos. 93, p. 1; 96, p. 4]. BCA "utilizes 'computer assisted dialing technology' manufactured and designed by Noble Systems to place telephone calls." [ECF Nos. 86-1, p. 4; 93, pp. 3, 6; 96, p. 5].

From April 2016 to September 2016, BCA used the IVR capability of its Noble predictive dialer to greet called persons with an automated prompt, asking them to press one key if the correct person had been called and a different key if the wrong number had been reached. [ECF Nos. 86-1, p. 4; 93, p. 6]. When an answering party selected the number indicating a wrong call during an IVR message, the FACS system

automatically generated a "B" flag. [ECF Nos. 93, pp. 2–3; 96, p. 11]. And if an answering person received a call from a BCA agent and indicated that the agent has called the wrong number, the agent selected a "WN" code within the Noble system to show that this is a wrong number. [ECF Nos. 93, p. 4; 96, p. 6]. At the end of each business day, the Noble system communicated to the FACS system which numbers received a "WN" code, and the next day, the Noble system would have no phone numbers with a "B" code. [ECF Nos. 93, p. 4; 96, p. 6].

BCA obtained Reyes' cellphone number from one of its clients, Barnabas Health, to collect a debt. [ECF Nos. 86-1, p. 1; 93, pp. 2, 5; 96, pp. 4, 7]. Barnabas gave BCA the patient's biographical information, including the phone number, as part of the patient's medical consent documentation. [ECF Nos. 93, p. 2; 96, p. 4]. But the name Barnabas associated with the cellphone number was not Reyes'. [ECF Nos. 86-1, p. 2; 93, p. 5].

Using the Noble predictive dialer, BCA placed six calls to Reyes' cellphone number. [ECF Nos. 86-1, p. 4; 93, pp. 2, 6; 96, p. 4]. Reyes did not answer the first five calls, and BCA stopped calling Reyes after the sixth call. [ECF Nos. 93, p. 2; 96, p. 4]. BCA never spoke to Reyes during any of the attempted communications. [ECF Nos. 93, p. 2; 96, p. 4].

BCA did not intend to call Reyes but was trying to reach someone else to collect a debt. [ECF Nos. 86-1, p. 1; 93, p. 6]. BCA did not manually dial Reyes' number first to confirm the intended caller. [ECF Nos. 86-1, p. 3; 93, p. 6]. And it is not BCA's policy

and procedure to manually dial a telephone number before autodialing it to make sure that the person on the other end is the intended recipient. [ECF Nos. 86-1, p. 3; 93, p. 6].

At least two of BCA's calls to Reyes were accompanied by an IVR. [ECF Nos. 86-1, p. 5; 93, p. 6]. The IVR Reyes received gave a message to the following effect: "If this is Jane Doe, press 1; 'if this is a wrong number,' press 2." [ECF Nos. 86-1, p. 6; 93, p. 6]. Reyes pressed two. [ECF Nos. 86-1, p. 4; 93, p. 6].

That ends the recitation of undisputed facts. Concerning other facts pertinent to class certification, the parties did not see eye-to-eye. There are three major areas of disagreement. The first two areas touch on BCA's call data, and the third concerns the issue of prior, express consent.

The first major disagreement concerns the coding BCA used in its collections system -- i.e., the "B" flags in FACS and the "WN" codes within Noble -- and what the codes may represent. Beginning with the "B" flag, BCA admits that a "B" flag may be added to a telephone number when "[t]he answering party selected the prompt within an IVR to indicate wrong number." [ECF No. 93, p. 3]. But BCA also takes the position that a "B" flag may be added for *other* reasons, listing the following as examples:

- The number is disconnected.
- Multiple, consecutive calls resulted in a temporarily disconnected message.
- Multiple, consecutive calls resulted in a triple tone (3 beeps output by carrier to indicate the call could not be completed).
- Multiple, consecutive calls resulted in no ring.
- Multiple, consecutive calls resulted in a busy signal.
- The answering party requested no more calls.

[ECF No. 93, p. 2].

Also, BCA claims that, in its experience, "it is not unusual for it to receive an inbound call from a telephone number *after* a 'B' flag has been added to that telephone number in FACS." [ECF No. 93, p. 3]. But BCA says that, even then, it will "*not* resume telephone calls to the number at issue, unless the party specifically indicates the telephone number is a good number at which the party can be reached." [ECF No. 93, p. 3]. And "[e]ven in those instances, the agent is not required to remove the 'B' flag from the number." [ECF No. 93, p. 3].

Concerning "WN" codes, BCA similarly claims that "[w]hile BCA trains its agents to use the 'WN' code when the called party says this is a wrong number, BCA's experience demonstrates that 'WN' does not necessarily mean BCA has called a wrong number." [ECF No. 93, p. 4]. BCA explains that, in its experience, "it is not unusual for a debtor to falsely claim BCA is calling a wrong number (either during a conversation with an agent or by utilizing the IVR system) in order to avoid speaking with a BCA agent regarding the unpaid debt." [ECF No. 93, p. 4]. But even so, BCA claims that its "standard operating procedure is to cease telephone calls if the answering party indicates BCA has called a wrong number." [ECF No. 93, p. 4]. BCA also states that "[i]t is not unusual for BCA to receive an inbound call from the debtor using a telephone number after a 'WN' result has been added to that telephone number in the Noble telephone system," but even in those instances, the company "does not resume

telephone calls to the number at issue." [ECF No. 93, p. 4].

For her part, Reyes agrees that "when the answering party selected the prompt within an IVR to indicate wrong number, a 'B' flag was automatically generated in FACS." [ECF No. 96, p. 5]. But Reyes disagrees with "the other alleged uses of the 'B' flag," arguing that BCA "has not identified a single specific instance where a 'B' flag signified anything other than wrong number for a proposed class member." [ECF No. 96, p. 5]. Reyes also argues that BCA "has not identified a single specific instance where it received an inbound call from a telephone number after a 'B' flag was added to the telephone number in FACS." [ECF No. 96, p. 5].

Similarly, Reyes agrees "that 'WN' is a code selected by a BCA agent if a call is answered and the call recipient informs Defendant that it is calling the wrong number." [ECF No. 96, p. 6]. But Reyes does not accept the argument that "'WN' does not necessarily mean BCA has called a wrong number," contending that, again, BCA "has not identified a single instance where a WN code did not necessarily mean it called a wrong number." [ECF No. 96, p. 6]. Moreover, Reyes argues that BCA has "not identified a single instance where it received an inbound call from a telephone number that had previously been associated with a WN code." [ECF No. 96, P. 6]. Nor, continues Reyes, has BCA "identified a single instance where a 'debtor [] falsely claim[ed] BCA is calling a wrong number (either during a conversation with an agent or by utilizing the IVR system) in order to avoid speaking with a BCA agent regarding the

unpaid debt.'" [ECF No. 96, p. 6].

The second major point of contention concerns the technological limitations within BCA's records-collection software. BCA claims that in its FACS system, "a query can be run to select phone numbers (if the phone number field is populated) with a corresponding 'B' phone flag." [ECF No. 93, p. 3]. But the system does not have the technical ability to do the following:

- Identify the specific reason a phone flag was set to "B."
- Determine the date a phone flag was set to "B."
- Determine when or if a call was made to a specific telephone number.
- Identify the historical setting of a phone number or a phone flag field. That is, BCA cannot determine what telephone number was in the telephone field at the time the "B" flag was first associated with that field. The number in the number field could have changed after the "B" flag was added, yet the "B" flag would still appear. Therefore, the "B" flag would be associated with a different number than the number with which it was initially associated.
- Provide "B" flagged numbers unique to a specific account. Any query for "B" flagged numbers would provide, among other things, every instance of the number which can be replicated among multiple accounts for the same consumer, multiple accounts across consumers who share a phone, or single accounts with the same number in multiple fields.

[ECF No. 93, p. 3].

The third and last disagreement centers on the prior-express-consent defense to a TCPA claim. As its second affirmative defense, BCA raised "prior express consent" and alleged that "Plaintiff's claims under the TCPA are not actionable as Defendant has established the requisite 'prior express consent' to communicate with the Plaintiff at the

telephone number provided as authorized by the Federal Communication Commission and the law of this Circuit." [ECF No. 8, p. 6]. BCA later withdrew that defense, but only as to Reyes *individually*, explaining in a notice that, "[b]ased on information learned and developed through the course of discovery in this case, BCA withdraws without prejudice its Second Affirmative Defense as to the individual named . . . Reyes only, and not as to any purported class members." [ECF No. 74, p. 1].

Concerning the potential class members, BCA states that Reyes' counsel "wrongfully contends that [the] approximately 301,000 unique telephone numbers were dialed by the Noble Dialer from April 2016 until September 2016 should be considered individuals that were contacted without prior express consent." [ECF No. 93, p. 4]. BCA sets forth its position as: "It is BCA's belief that BCA had prior express consent to call each of these numbers (other than the number belonging to Plaintiff) as each number was provided to BCA by its client, who represented the number had been provided to the client by the patient." [ECF No. 93, p. 4].

In response, Reyes says that BCA "fails to provide any evidence that it had prior express consent to contact any particular individual." [ECF No. 96, p. 7].

Additional facts relevant to class certification are also present in the class-certification supplemental briefing. First, Reyes points out in her supplemental brief that a BCA interrogatory answer is that "[f]rom April 2016 to September 2016, utilizing the NOBLE IVR/RPC dialer, Defendant dialed 459,526 telephone numbers . . . of which

301,058 were cellular telephone numbers[.]" [ECF No. 112, p. 2 (citing ECF No. 56-1, pp. 5, 7 ¶¶ 9, 12) (internal quotations omitted)]. And of those cellphone numbers, BCA "delivered prerecorded messages to at least 144,686 of them." [ECF No. 112, p. 2].

In addition, Reyes submits that, through discovery, it is now known that of the 301,058 cellular phone numbers that BCA called during that time, 4,717 were associated with a "WN" code, and 9,009 were associated with a "B" flag. [ECF No. 112, p. 3]. Moreover, Reyes highlights that although it asked BCA, though an interrogatory, to identify any instance of prior, express consent by any of the 301,058 cellphone numbers called, BCA did not provide the evidence. [ECF No. 112-2, p. 3 (answering: "Without a file-by-file review and individual inquiry into each of the several hundred thousand files at an exorbitant expense of time and monetary resources, Defendant maintains that all the calls to cellular telephone numbers during that time were made with the prior express consent of the called party.")].

In its supplemental brief, BCA does not dispute the numbers put forth by Reyes (i.e., 301,058 cellular phone numbers called; 144,686 prerecorded messages; 4,717 "WN" codes; and 9,009 "B" flags). Instead, BCA continues to maintain that "B" flags have a "variety of potential meanings, including that the answering party indicated 'wrong number,'" and that "WN" codes do not establish that BCA in fact called a wrong number, only that a person to whom BCA placed a call *told* BCA that it had called a wrong number. [ECF No. 116, pp. 2–3]. BCA also denies that simply because its system

assigns a "cell" flag to a telephone number, that the number was in fact associated with a cellphone. [ECF No. 116, p. 3 n.3].

Moreover, BCA maintains that FACS cannot provide "*historical* data in a three-dimensional manner." [ECF No. 116, p. 5]. This position means that fields within FACS are constantly changed, and that there is no track record of those changes. [ECF No. 116, pp. 5–6]. So when BCA ran the query for those numbers associated with "B" flags and "WN" codes, the results showed only what numbers were associated with what flags or codes as of the time of the *inquiry*, and not as of the time relevant to the lawsuit. [ECF No. 116, p. 6].

In her supplemental reply, Reyes does not contest that "B" flags and "WN" codes "may not independently 'establish as a matter of fact' that Defendant reached a wrong number with infallible certainty." [ECF No. 117, p. 2]. But Reyes submits that this lack of certainty does not preclude class certification "where potential class members can easily sign claim forms, submit short affidavits, or produce telephone records to confirm membership in the proposed class, in response to targeted notice based on WN codes and B flags." [ECF No. 117, p. 2].

## II.     Legal Standard

### A.     *Class-Certification Standard*

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact

sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In view of the broad discretion a court has in certifying a class, any such decision must rest on a "rigorous analysis" that Rule 23's requirements are met. *Venerus v. Avis Budget Car Rental, LLC*, No. 16-16993, 2018 WL 565260, at *6 (11th Cir. Jan. 25, 2018) (citing *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,* 601 F.3d 1159, 1169 (11th Cir. 2010)). In other words, "[t]he party seeking class certification has a burden of *proof*, not a burden of pleading." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016).

But while the court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

A party seeking to certify a Rule 23 class must first demonstrate the following four requirements under Rule 23(a):

(1)     the class is so numerous that joinder of all members is impracticable;
(2)     there are questions of law or fact common to the class;
(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). If the party seeking class certification fails to demonstrate any of these requirements, then the case may not continue as a class action. *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 696 (S.D. Fla. 2004) (internal citations omitted).

In addition to meeting Rule 23(a)'s four requirements, the party seeking class certification must prove that one of Rule 23(b)'s requirements is met. *Vega*, 564 F.3d at 1265. Here, Reyes is seeking certification under Rule 23(b)(3). That means that she must show "predominance" and "superiority." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 689 (S.D. Fla. 2013). That is, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Vega*, 564 F.3d at 1265.

**B.    *Daubert Standard***

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n. 7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *U.S. v. Frazier*, 387 F.3d 1244, 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341; *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla.

Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Products Liab. Lit.*, No. 08-MD-01928, 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010) (quoting *Quiet Tech*, 326 F.3d at 1341).

III. **Analysis**

BCA focuses its class-certification opposition on three general grounds: (1) the ascertainability and administrative feasibility of Reyes' proposed class, (2) the predominance of common issues over individual issues, and (3) the superiority of a class action over individual actions. The parties' experts' opinions relate mostly to the first challenged ground, and, in particular, to the feasibility of identifying potential class members. Therefore, the *Daubert* challenges will be discussed in the analysis section that tackles ascertainability and administrative feasibility. Lastly, the Court will address whether the proposed class is a fail-safe class under the class definition section, which will also define the class to be certified.

A. *Ascertainability and Administrative Feasibility*

Before considering Rule 23's explicit requirements, the Court must determine whether the proposed class has been adequately defined and is ascertainable. *Little*, 691 F.3d at 1304. This is an implicit requirement under Rule 23. *Ward v. EZCorp, Inc.*, 679 F.

App'x 987 (11th Cir. 2017). The Eleventh Circuit has explained, in an unpublished opinion, that "a class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (citing *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787–88 (11th Cir. 2014)).

*Karhu* also holds that the plaintiff bears the burden of proposing "an administratively feasible method by which class members can be identified." *Id.* at 947. And in doing so, the plaintiff "cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Id.* at 948. Moreover, "a plaintiff cannot satisfy the ascertainability requirement by proposing that class members self-identify (such as through affidavits) without first establishing that self-identification is administratively feasible and not otherwise problematic." *Id.*

But before getting to the analytical specifics, Reyes challenges the proposition that ascertainably requires a showing that class members must be identified in an administratively feasible way, as set forth in *Karhu*. [ECF No. 59, pp. 22–23 n.11]. Reyes argues that this "heightened ascertainability standard" was first set forth by the Third Circuit Court of Appeal in *Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012), but was then eroded by later Third Circuit cases and disapproved of by other

Circuits. Reyes then urges the Court to not follow *Karhu*, which cited to *Marcus*, among other cases, when outlining an administratively-feasible standard.

In *Marcus*, the Third Circuit vacated a class certification with instructions that, on remand, the district court had to determine "whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative." *Id.* at 594. The Third Circuit further cautioned that the district court should not "approv[e] a method that would amount to no more than ascertaining by potential class members' say so," such as by having the potential class members submit self-identifying affidavits. *Id.*

In 2015, the Third Circuit clarified that "[t]he ascertainability inquiry is narrow," requiring only that plaintiffs "show that class members can be identified." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 165 (3d Cir. 2015), *as amended* (Apr. 28, 2015). The issue necessitating the clarification was that defendants were improperly using the ascertainability requirement to challenge *other* Rule 23 requirements. *Id.* The Third Circuit thus instructed that where "defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements." *Id.*

Then, in 2017, the Third Circuit clarified further that its "ascertainability precedents do not categorically preclude affidavits from potential class members." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 440 (3d Cir. 2017). The

Third Circuit explained that plaintiffs "need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership," and that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." *Id.* at 441.

Reyes also points out that, even before this 2017 clarification, other circuits had declined to follow *Marcus*, particularly as to its seemingly categorical rejection of self-identifying affidavits as a means to satisfy the ascertainability standard. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 661–62 (7th Cir. 2015) (explaining that "[t]he demands of this heightened requirement are most apparent from the Third Circuit's discussion of self-identification by affidavit. It has said that affidavits from putative class members cannot satisfy the stringent ascertainability requirement," and then declining to adopt a similar rule); *see also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017), *cert. denied sub nom.* 138 S. Ct. 313 (2017) ("In summary, the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification, and the policy concerns that have motivated the Third Circuit to adopt a separately articulated requirement are already addressed by the Rule. We therefore join the Sixth, Seventh, and Eighth Circuits in declining to adopt an administrative feasibility requirement.") (collecting cases).

Here, the Court declines the invitation to simply ignore *Karhu*. Although I concur with the view that ascertainability is a narrow inquiry and that there is no categorical

prohibition against using affidavits for identification purposes, *Byrd*, 784 F.3d at 165; *City Select Auto Sales*, 867 F.3d at 441; *Mullins*, LLC, 795 F.3d at 661–62, I interpret *Karhu* as being in line with that view.

Nowhere does *Karhu* comingle the administrative-feasibility requirement with any other Rule 23 requirement, a problem that underlies much of the criticism of *Marcus*. Rather, as the Eleventh Circuit said in *Karhu*, the plaintiff must show "an administratively feasible method by which class members can be *identified*." *Id.* at 947 (emphasis added). Nothing more, nothing less. As one court in this district put it: "when considering whether Plaintiff has satisfied the implicit, threshold requirements of ascertainability under Rule 23, the Court *only considers whether class members can be identified at all*, at least in any administratively feasible (or manageable) way." *Miller v. Wells Fargo Bank, N.A.*, No. 1:16-CV-21145-UU, 2017 WL 698520, at *4 (S.D. Fla. Feb. 22, 2017) (internal quotations omitted and emphasis added) (citing *Karhu* with approval).

Moreover, I do not interpret *Karhu* as absolutely **precluding** the use of a defendant's records and potential class members' affidavits for identification purposes. Rather, that dual approach may be used so long as the records "are in fact useful for identification purposes" and "self-identification is administratively feasible and not otherwise problematic." *Karhu*, 621 F. App'x at 946. Consequently, there is no categorical prohibition against the types of information that may be used to identify

potential class members.[5]

The Court also finds notable that, even into 2018, district courts in this Circuit have continued following the rules outlined in *Karhu* (and similar cases). *See, e.g.,* *Cotromano v. United Techs. Corp.*, No. 10-80840-CIV, 2018 WL 2047468, at *10 (S.D. Fla. May 2, 2018) (Marra, J.); *Alderman v. GC Servs. Ltd. P'ship*, No. 2:16-CV-14508, 2018 WL 542455, at *3 (S.D. Fla. Jan. 19, 2018) (Bloom, J.).

Accordingly, when determining ascertainability, the Court *will* address whether Reyes has set forth an administratively feasible method of identifying class members.

Moving on to the substantive arguments, Reyes argues that she *has* proposed an administratively feasible method of identifying class members. She submits that her class is administratively feasible because BCA's records show what telephone numbers it called using the Noble predictive dialer, which of those numbers are assigned to cellphones, and which of those numbers include a "B" flag or "WN" code, which are associated with wrong numbers. [ECF No. 59, p. 23]. Reyes then maintains that her expert can use that information to identify the names and addresses associated with those numbers. [ECF No. 59, p. 23].

---

[5] As a result, I reject BCA's position that "[t]his self-identification method was all but stamped-out of existence by the [Eleventh] Circuit Court in *Karhu*[.]" [ECF No. 82, p. 16]. That is incorrect, and BCA cites to no cases that interpreted *Karhu* in the same manner. *Karhu* notes that "[a] plaintiff proposing ascertainment via self-identification . . . must establish how the self-identification method proposed will avoid the potential problems" discussed in the opinion. 621 F. App'x. at 949. This is inconsistent with the view that a self-identification method is absolutely **unavailable.**

Reyes' expert is Anya Verkhovskaya, who is the managing director of a company that offers "litigation support services with a focus on data analysis management." [ECF No. 59-4, p. 2]. In a declaration and expert report that Reyes attaches to her class-certification motion, Verkhovskaya avers that she has been the project director "in hundreds of class action administrations, including Telephone Consumer Protection Act" cases, and has "over 17 years of experience directing various aspects of class action data management." [ECF No. 59-4, p. 3].

Verkhovskaya then details how she would identify "(i) whether particular telephone numbers were assigned to cellular telephones as of the dates certain calls were placed to those numbers, and (ii) whether and how the names of subscribers/users associated with the telephone numbers can be identified as of the dates at issue." [ECF No. 59-4, pp. 3–4]. Stated simply, she would "partner with reputable data vendors, such as LexisNexis, Experian, Microbilt, TransUnion, and others," to utilize "reverse-append processes" or "skip-tracing services" or "information from public and proprietary records" to match telephone numbers to particular names and addresses and cellular services. [ECF No. 59-4, pp. 4–5]. Verkhovskaya adds that she has used these methods several times in connection with other class actions. *Id.*

Verkhovskaya also explains that if these methods fail, then "subscriber names and addresses could be identified via a carrier subpoena process." [ECF No. 59-4, p. 6]. According to her, "[e]ach of the seven or so wireless carriers could be subpoenaed to

produce subscriber identifying information, such as name, address and other information, based upon the cellular telephone number for a particular subscriber." [ECF No. 59-4, p. 6].

In addition, Verkhovskaya testifies that "[a]fter identifying the names and addresses of individuals associated with the telephone numbers of the calls at issue," she would "update the addresses through the use of the United States Postal Service (USPS) National Change of Address (NCOALink®) database," which provides daily-updated address information. [ECF No. 59-4, pp. 6–7]. And if that fails, Verkhovskaya says that she would then use skip-tracing to obtain updated services for persons not found through NCOALink. [ECF No. 59-4, p. 7].

Lastly, Verkhovskaya states that, using the processes she laid out, she identified Reyes' own cellphone number and address. [ECF No. 59-4, p. 7].

In its opposition response to class certification, BCA argues that the proposed class is not administratively feasible because (1) it "presumptively" had consent to call costumers because "BCA only dials telephone numbers provided by patients to Barnabas," and (2) a "B" flag or "WN" notations do not "affirmatively" establish that BCA dialed a wrong number. [ECF No. 82, pp. 3–8]. Therefore, BCA concludes, its records cannot be used to identify potential class members.

BCA also challenges the methodology employed by Reyes' expert to identify potential class members as "inherently flawed and unreliable" because it relies on third-

party databases that are subject to large error rates. [ECF No. 82, pp. 9–12]. As support, BCA submits a rebuttal expert, Jan Kostyun, who is an "independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies." [ECF No. 82-5, p. 5].

Kostyun's expert report criticizes Verkhovskaya's report on several grounds, although, for purposes of this class-certification motion, only a few need to be discussed here. He mainly criticizes Verkhovskaya for delegating the call-records analysis to third-party vendors, whose results he characterizes as having "questionable accuracy." [ECF No. 82-5, p. 9]. Kostyun contends that the accuracy of information gathered from public and commercial databases, like LexisNexis, are unreliable, inaccurate, and error-prone. [ECF No. 82-5, pp. 10–12]. And he especially notes that LexisNexis (and similar vendors) displays a disclaimer in its database, informing users that its results should be "independently verified." [ECF No. 82-5, pp. 11–13].

Kostyun also opines on the need for individualized inquiries, summarizing his opinion as follows:

> subscribers and authorized users of wireless numbers as of historical dates of alleged calls cannot be accurately and reliably identified without a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, the individual subscribers and users themselves.

[ECF No. 82-5, p. 4].

As an initial, threshold decision, I reject BCA's bid to strike Verkhovskaya's

expert opinion under *Daubert*. The Court finds persuasive the opinion in *Shamblin v. Obama for America*, No. 8:13-CV-2428-T-33TBM, 2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) on this point. That Court denied a motion to strike Verkhovskaya's expert opinion in a TCPA case (although it then denied certification of the TCPA class).

The Court found that Verkhovskaya was "amply qualified" to "offer expert testimony in TCPA case." *Id.* at *3. The Court also found that Verkhovskaya "employ[ed] generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by Verkhovskaya's company[.]" *Id.* Thus, the Court concluded, Verkhovskaya's testimony "satisfy[ied] the strictures of *Daubert*." *Id.*

Several other district courts have also relied on Verkhovskaya's expertise when deciding whether to certify TCPA and other classes. *See Youngman v. A&B Ins. & Fin., Inc.*, No. 616CV1478ORL41GJK, 2018 WL 1832992, at *4 (M.D. Fla. Mar. 22, 2018), *report and recommendation adopted*, No. 616CV1478ORL41GJK, 2018 WL 1806588 (M.D. Fla. Apr. 17, 2018); *Cordoba v. DirecTV, LLC*, 320 F.R.D. 582, 599 (N.D. Ga. 2017); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 391 n.3 (M.D.N.C. 2015); *Burns v. First Am. Bank, No. 04 C 7682*, 2006 WL 3754820, at *11 (N.D. Ill. Dec. 19, 2006). The Court will do the same here.

To be sure, BCA's expert does raise salient gaps in Verkhovskaya's methodology. But a less-than-perfect opinion may still be admissible, even if it contains gaps. *In re Trasylol Prods. Liab. Litig.*, 2010 WL 1489793, at *6. And because the testimony is not

being used for trial purposes (at least not yet), the same jury-gate-keeping policy does not weigh heavily into the consideration.

In short, the Court will not strike Verkhovskaya's opinion at this time and will consider it when deciding the administrative-feasibility question.

On that question, the Court agrees with Reyes that she has presented an administratively feasible method of identifying class members. Although "B" flags or "WN" notations may not incontrovertibly establish that BCA dialed a wrong number, and thus would not conclusively establish who is a class member, that fact does not defeat class certification because Reyes is not proposing to rely solely on BCA's records to identify class members. Rather, those notations would represent a *starting point* from which Reyes can further define the class through the methods described by her expert, including the use of self-identifying affidavits and subpoenas.

That method would be consistent with *Karhu*. Reyes is not "establish[ing] ascertainability simply by asserting that class members can be identified using [BCA's] records." 621 F. App'x at 946. Rather, Reyes is saying that those "records are in fact useful for identification purposes" because they narrow the potential class. *Id.* Moreover, there is no indication that, in this particular case, self-identification through affidavits is not administratively feasible or "otherwise problematic." *Id.*

Furthermore, the Court disagrees with BCA's position that the limitations in its records keeping (i.e., the different meanings of its coding and the lack of historical track

record in the coding) prove fatal to class certification. The problem with that position is that, in simultaneously rejecting other methods by which potential class members may be identified, BCA is "essentially arguing that the contours of the class should be defined by [its] own recordkeeping." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (rejecting similar argument in a TCPA case). But that "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct." *Id.* Moreover, "[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct." *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *see also Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *7 (D.N.M. June 5, 2018) (granting motion to certify class in TCPA case and rejecting challenge to ascertainability by noting that "[t]he fact that the class may inadvertently include some customers that consented is not fatal to the predominance inquiry, especially since they can be weeded out.").

In addition, my conclusion is further supported by not just what Reyes has presented, but also by what BCA has *failed* to present. Specifically, although BCA *says* that a "B" flag may have meanings other than to indicate a "wrong number," BCA presents no *evidence* of any actual phone number that was coded with a "B" flag to indicate something *other than* a wrong number. Similarly, BCA has presented no

*evidence* that a WN-coded phone number corresponded to something different from a wrongly-dialed number. And neither has BCA shown a single instance whether a phone number designated as a cellphone was not actually a cellphone when the subject calls took place.

Moreover, "a number of courts have rejected this theory in 'Wrong Number' cases, under similar factual circumstances, at the class certification stage" -- i.e., that there are many reasons why a number could be coded as a wrong number. *Lavigne*, 2018 WL 2694457, at *8; *see also West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 301–02 (N.D. Cal. 2017) ("several district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number'"); *Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501, 503 (S.D. Ind. 2016) (certifying TCPA action even though the defendant "point[ed] out the distinct possibility that every record marked as a wrong number may not have actually been a wrong number"); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 307 (S.D. Cal. 2015) (finding class ascertainable despite argument that "the term 'wrong number' could appear in an account holder record where an account holder has changed phone numbers or is trying to evade a debt collection by falsely stating defendant's associate had reached a wrong number.").

That is not to say, of course, that BCA must prove its entire case to defeat class

certification. And it does not escape the Court that the burden of proving ascertainability falls on Reyes. But, even so, BCA must present more than mere speculation to defeat class certification.

In short, the Court finds that Reyes' proposed class is ascertainable and administratively feasible.

**B.     *Rule 23(b)(3)'s Requirements***

"In addition to establishing the Rule 23(a) requirements, a plaintiff must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b)." *Little*, 691 F.3d at 1304; *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1279 (11th Cir. 2000). In this case, Reyes invokes Rule 23(b)(3). That rule "permits class certification if 'the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy.'" *Little*, 691 F.3d at 1304 (quoting Rule 23(b)(3)). "These are commonly referred to as the predominance and superiority requirements." *Manno*, 289 F.R.D. at 688-89 (internal citation omitted).

**1.     Predominance**

To satisfy the predominance requirement, a plaintiff must establish that the issues subject to generalized proof in the class action, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof. *See*

*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). Predominance does not require that "all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557. If the liability issue is common to the class, then common questions predominate over individual questions. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987).

BCA argues that three issues that require individualized proof will predominate over the common issues: (1) whether an intended caller gave consent, (2) whether a called number belonged to a cellular phone, and (3) the name of the subscriber on the telephone account. [ECF No. 82, p. 17]. The Court disagrees that these individual issues will predominate.

Addressing the consent issue first, the Court finds *Mohamed v. American Motor Company*, LLC, 320 F.R.D. 301 (S.D. Fla. 2017) persuasive. In that TCPA class-action case, which concerned text messages, the defendant argued "that 'individualized' issues regarding 'prior express consent' preclude a predominance finding." *Id.* at 316. But the Court rejected that position because the defendant "only offered 'bare assertions' concerning express consent without identifying a single instance in which such consent was, in fact, obtained prior to the sending of the text messages at issue[.]." *Id.* Consequently, the court concluded that "[s]uch bare assertions cannot defeat certification under Rule 23." *Id.*

Other cases in this and other districts concur with this view -- i.e., that

unadorned consent defenses will not defeat class certification. *See Cabrera v. Gov't Employees Ins. Co.*, No. 12-61390-CIV, 2014 WL 11894430, at *5 n.4 (S.D. Fla. Sept. 29, 2014) (rejecting the same consent argument because, given the lack of relationship between the defendants and the class members, "the Court believes that consent is unlikely to be a major issue at trial," and because one defendant "offered only bare assertions of consent, without identifying a single instance in which consent was in fact obtained."); *accord Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 469 (N.D. Ill. 2017) (collecting similar cases); *see also Johansen v. One Planet Ops, Inc.*, No. 2:16-CV-00121, 2018 WL 1558263, at *5 (S.D. Ohio Mar. 5, 2018) ("In order to demonstrate that individuals consented to the calls, Defendants must marshal *some* evidence of prior express consent, such as a screenshot of a completed consent form for an individual plaintiff or a list of IP addresses of individual plaintiffs who consented to the calls. They have not."); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL 1466247, at *12 (W.D. Wash. Mar. 30, 2015) ("Although Defendants are in the best position to come forward with evidence of consent, they have not done so. On the current record, the court cannot agree that individualized inquiries into members' consent will predominate at trial."); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) ("courts should ignore a defendant's argument that proving consent necessitates individualized inquiries in the absence of any evidence that express consent was actually given. It also means that courts should afford greater weight to a plaintiff's

theory of class-wide proof of lack-of-consent when that theory is entirely unrebutted by the precise type of evidence which could do it greatest harm—evidence of express consent").

By contrast, in many of the cases that have refused to certify TCPA classes because of individualized issues of consent, the defendant actually showed proof of consent and that consent could have been obtained in many different ways. *See Newhart v. Quicken Loans Inc.*, No. 9:15-CV-81250, 2016 WL 7118998, at *5 (S.D. Fla. Oct. 12, 2016) (refusing to certify class where the defendant "adduced substantial (and unrefuted) evidence that borrowers provided written and oral prior express consent to receive calls on their cell phones . . . in a variety of ways."); *Shamblin*, 2015 WL 1909765, at *11 (refusing to certify class whether defendants provided that "consent was obtained in a multitude of ways—such as website signups, signups at events, campaign contributions, contest submissions, online petitions, and 'offline' signups (e.g., door to door field signups)—through which individuals provided their cell phone numbers to either [defendant].").  Thus, certification was inappropriate in those cases because determining whether someone gave consent, and how, would result in individual "mini-trials." *Shamblin*, 2015 WL 1909765, at *11.

Here, BCA provides nothing but bare assertions of its consent defense. This is epitomized by its answer to an interrogatory, which asked: "For the 301,058 cellular telephone numbers to which Defendant placed calls from April 2016 to September 2016

by using the 'computer assisted dialing technology manufactured/designed by Noble,' *identify the cellular telephone numbers for which it maintains 'documented prior express consent of the called party.'*" [ECF No. 112-2, p. 3 (emphasis added)]. BCA answered:

> *Without a file-by-file review and individual inquiry* into each of the several hundred thousand files at an exorbitant expense of time and monetary resources, Defendant maintains that *all the calls to cellular telephone numbers during that time were made with the prior express consent of the called party.*

[ECF No. 112-2, p. 3 (emphasis added)].

This broad and bare-boned answer is no better than a boilerplate affirmative defense, which would not be sufficient to defeat class certification. The answer is also not correct. Reyes was one of the call recipients during that time, and the parties have already agreed that Reyes did not consent to being called. Indeed, like in *Cabrera*, given the lack of evidence of consent and the fact that class members would be persons with no prior business relationship with BCA and who BCA did not intend to call, it appears that consent will not likely play a major role at trial.

Notably, BCA has also taken the position in this case that it may establish consent *without* resorting to individualized inquiries. In its opposition response, BCA argues that "[t]he persons whom BCA attempted to reach through the subject calls *presumptively* gave their consent by providing their telephone numbers to the creditor." [ECF No. 82, p. 17 (emphasis added)]. Given that BCA maintains that it "only dials telephone numbers provided by patients" to its healthcare companies [ECF No. 82, p. 3], then, at trial, BCA will likely argue that it had consent to call *all* such patients.

Unlike in the cases where courts have denied class certification, BCA has not put forth that there are different "'buckets' of consent evidence" that the Court will need to sort out on an individual basis. *Newhart*, 2016 WL 7118998, at *4. Rather, it has taken the position that even "*[w]ithout a file-by-file review and individual inquiry*," it had consent to call *all* potential class members. [ECF No. 112-2, p. 3 (emphasis added)].[6]

Concerning the potential inquiries into whether a called number belonged to a cellular phone and the name of the subscriber on the account, the Court does not find that these issues preclude class certification either. Subscribers will be identified as potential class members are identified, using the methods described by Reyes' expert. Moreover, BCA has represented under oath how many of the dialed numbers belonged to cellphones at a given time. [ECF No. 112, p. 2 (citing ECF No. 56-1, pp. 5, 7 ¶¶ 9, 12) (internal quotations omitted)]. BCA knows this because it assigns a "cell" flag to its telephone numbers. [ECF No. 116, p. 3 n.3]. And although BCA argues that a tag does not necessarily show that a cellphone number was called at the relevant time, as with the issue of consent, BCA has not shown a single instance where a phone number

---

[6]      To be sure, at least one judge has refused to certify a TCPA class due to concerns over individualized consent inquiries, even where the defendant did not put forth evidence of consent. *See Balthazor v. Cent. Credit Servs., Inc.*, No. 10-62435-CIV, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012) ("Turning to Plaintiff's argument that consent is not an issue because 'Defendant has not produced any evidence of consent,' while it is true that CCS will ultimately bear the burden of establishing prior express consent, at the class certification stage, the burden is on the Plaintiff to establish the Rule 23 factors."). I, however, do not find *Balthazor* persuasive or applicable here in light of the other authorities already discussed and the factual background of this case.

designated as a cellphone was not actually a cellphone when the subject calls took place. Again, mere speculation is not enough to overcome class certification.

At bottom, as one court in this district put it, "[t]he question of whether [BCA] made the calls at issue and whether it did so using an automated dialing system . . . are the central and predominate issues before the Court." *Cabrera*, 2014 WL 11894430, at *5. That is not to say, however, that this will always be the case. "This Court is well aware of its obligation to continually evaluate the appropriateness of class treatment and to adjust or decertify if the circumstances warrant." *Manno*, 289 F.R.D. at 692; *see also Shin v. Cobb Cty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001) (stating that the Court retains "the ability, and perhaps even a duty, to alter or amend a certification decision" as circumstances change).

Therefore, if individualized issues do make the class action untenable, then the Court may revisit the certification question. *See Abdeljalil,* 306 F.R.D. at 311 (rejecting argument that proposed TCPA class did not meet the predominance factor, but noting that "if, after the case proceeds, evidence is discovered that the questions of fact and law require burdensome individualized inquiry, [then] this Court may revisit certification at that time").

In short, the Court finds that Reyes has met the predominance prong of Rule 23(b)(3).

## 2.       *Superiority*

The focus of the superiority analysis is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183–84 (11th Cir. 2010) (internal citation omitted). In this vein, the predominance analysis has a large effect on the superiority analysis, because "the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims, both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability[.]" *Id.* at 1184 (internal citations and alterations omitted).

Here, BCA raises only one argument against the superiority of a class action: "The proposed class members are not alleged to have suffered any actual injury. Yet if successful, they would receive a multi-million dollar judgment that would ruin BCA." [ECF No. 82, pp. 18–19]. This ruinous-damages argument, however, has been persuasively rejected by other courts in this district. *See Mohamed*, 320 F.R.D. at 318 (rejecting the same argument, and explaining, "We agree with Judge Seitz that the threat of disproportionate damages is 'not [an] appropriate consideration for a court assessing the superiority of a class action.'") (quoting *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, No. 12-22330-CIV, 2014 WL 7366255, at *9 (S.D. Fla. Dec. 24, 2014) ("Defendants' primary argument . . . is that a class action would subject them to

potentially ruinous liability on the basis of an unintentional, technical violation of a confusing regulation that caused no economic harm to the class . . . . To the extent that the Court shares some of these misgivings, they are not appropriate considerations for a court assessing the superiority of a class action.")).

I likewise reject BCA's argument as inappropriate to the superiority inquiry. Moreover, the potential damages are a speculative matter, which should be addressed on another day. *Manno*, 289 F.R.D. at 692 ("the Court finds it would be imprudent, premature, and speculative to deny certification on the mere possibility that damages may be huge. That contingency will be dealt with another day, should it come to pass."). As stated previously, the Court will continuously monitor the class action and decertify the class if changed circumstances warrant it.

Lastly, the Court further finds that TCPA claims, in general, are well suited for class treatment. As one court succinctly put it:

> As a general matter, TCPA classes are routinely certified as class actions because the "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims" all point toward the superiority of a class action.

*Physicians Healthsource*, 2014 WL 7366255, at *9.

Accordingly, the Court finds that Reyes has met the superiority prong of Rule 23(b)(3).

C.    *Class Definition*

  1.    **"Fail-Safe" Class**

BCA argues that Reyes proposes an impermissible "fail-safe" class because, to be a class member, one would "determine the 2 primary elements of a TCPA claim and also[] determine BCA's consent defense." [ECF No. 82, p. 12]. The Court does not agree.

As one Middle District of Florida case has explained, "[a] fail-safe class is one whose definition incorporates the elements of a successful legal claim, such that determining whether an individual or entity is a member of the class front-ends a merits determination on [the defendant's] liability." *JWD Auto., Inc. v. DJM Advisory Grp. LLC*, 218 F. Supp. 3d 1335, 1342 (M.D. Fla. 2016) (internal quotations omitted). Thus, "[b]eing granted membership in the class is thus synonymous with a victory on the underlying claim." *Id.* In addition, because a fail-safe class is defined in a way where a class member qualifies if he has a valid claim, the existence of a fail-safe class "cannot be ascertained until the conclusion of the case, when liability is determined." *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 623 (E.D. Pa. 2015).

The fail-safe doctrine is not convincing here.

In the first place, the viability of the fail-safe doctrine in this Circuit is uncertain. "The Eleventh Circuit has not yet addressed whether a fail-safe class can nevertheless be certified, and there is a split of authority among the Circuit Courts that have decided

the issue." *JWD Auto.*, 218 F. Supp. 3d at 1343 (collecting cases).[7] So, as a general matter, I hesitate to deny class certification based on a doctrine not recognized by our Circuit.

In any event, the class definition does not explicitly limit members to those who have not given consent to be called. The class is limited to those calls "directed to a number assigned to a cellular telephone service, but not assigned to the intended recipient of BCA Financial Services, Inc.'s calls." [ECF No. 59]. A practical result of this definition might be that a class member would not have given consent to be called, given that BCA did not intend to call that person in first place. But that may not always be the case. For example, a BCA healthcare client might have inadvertently swapped the phone numbers of two patients. Had that happened, Patient A may not have been the intended recipient of BCA's call about the debt owed by Patient B, but Patient A nonetheless would have given prior consent to be contacted in a different form.

In short, the Court is unwilling to deny class certification here based on the not-yet-established-in-this-Circuit doctrine (which precludes certification to a so-called impermissible fail-safe class) under facts that do not clearly and neatly fit into the doctrine (if it even applies).

---

[7]     *JWD Automotive* is a "junk fax case." 218 F. Supp. 3d at 1338. The Court declined to dismiss the case on the fail-safe class argument, deciding that the argument is more appropriately raised at the class-certification stage. *Id.* at 1343. The Undersigned is not determining whether the doctrine is legally viable. Instead, the conclusion is that the doctrine, assuming that it is recognized, is inapplicable here under the specific facts.

## 2.    Amending the Class Definition

As Reyes submitted in her supplemental brief, the Eleventh Circuit has "foreclosed the possibility of a multiple-call safe harbor for unintentionally calling the wrong party." *Schwyhart v. AmSher Collection Servs., Inc.*, 182 F. Supp. 3d 1239, 1242 (N.D. Ala. 2016) (citing *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251–52 (11th Cir. 2014)). Moreover, in *ACA International v. Federal Communications Commission*, 885 F.3d 687, 707 (D.C. Cir. 2018), the D.C. Circuit rejected the FCC's proposed "one-call safe harbor" as arbitrary. BCA does not address this issue in its supplemental response and therefore does not provide contrary authority.

"Rule 23(c)(1) specifically empowers district courts to alter or amend class certification orders at *any* time prior to a decision on the merits." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). The Court exercises that power here by amending the class definition to read as follows (designated by a bracket):

> All persons and entities throughout the United States (1) to whom BCA Financial Services, Inc. placed [a] call, (2) directed to a number assigned to a cellular telephone service, but not assigned to the intended recipient of BCA Financial Services, Inc.'s calls, (3) by using computer assisted dialing technology manufactured or designed by Noble, (4) from September 23, 2012 through September 23, 2016.

The Court, however, will not add to the class definition potential class members who received a call using the IVR capability of the Noble predictive dialer. Reyes'

Complaint repeatedly alleged that BCA violated the TCPA by using an *automatic telephone dialing system*. [ECF No. 1, pp. 1, 3–7 ¶¶ 2, 24–25, 33, 37–38, 43, 52]. In the one specific allegation within her TCPA count, she likewise alleged that BCA violated the TCPA "by using an *automatic telephone dialing system* to place non-emergency calls to Plaintiff's cellular telephone number, absent prior express consent." [ECF No. 1, p. 9 ¶ 74 (emphasis added)]. Nowhere does she allege that BCA called her **using an artificial or prerecorded voice.**

Moreover, although Reyes' *original* class definition broadly included violations for "using an automatic telephone dialing system or an artificial or prerecorded voice," [ECF No. 1, p. 6 ¶ 44 (emphasis added)], Reyes then changed that class definition, removing any reference to artificial or prerecorded voices. [ECF No. 59, p. 1]. Moreover, the Court does not accept the implicit position in Reyes' supplemental brief that it is only "now evident," i.e., after the discovery that necessitated the supplemental briefing, "that this Court can properly certify a class of all persons to whom Defendant delivered a prerecorded message." [ECF No. 112, p. 6]. Reyes knew before that time of BCA's use of an IVR, and there is no indication whatsoever that she was unable to amend her Complaint to include such a claim or add such a claim to her class definition.

IV.  **Conclusion**

For the reasons outlined above, the Undersigned **grants in part** and **denies in part** Reyes' motion for class certification. The Court also **denies without prejudice** the

motion to strike Verkhovskaya's expert testimony and **denies as moot** the motion to strike Kostyun's expert testimony.

Within ten days of this Order, the parties shall submit a revised proposed class notice for the Court to review. The Court urges the parties to submit a joint notice, with agreed-upon language. But if the parties cannot agree, then they shall submit separate proposed notices. **The parties shall also by the same deadline email a "Word" version of the proposed notice (or notices) to the Court's e-file inbox.**

DONE **and ORDERED** in Chambers in Miami, Florida, on June 26, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
All counsel of record